HIRAM J. PURDY, PLAINTIFF, *v.* THE ROCHESTER
PRINTING COMPANY, DEFENDANT.

*Libel — when an article is libelous per se.*

An article published in a newspaper stated in effect that a coroner, who was also
a physician, had held an inquest on a man, supposing him to be dead, when he
was in fact alive, and that the man would have been pronounced dead and
buried alive but for the fortunate arrival on the scene of another physician, .
who discovered that the man was living and succeeded in resuscitating him.
*Held,* that the article was libelous *per se.*

MOTION for a new trial on exceptions ordered to be heard in the
first instance at the General Term, after a verdict in favor of the
defendant directed by the court.

The action was brought to recover damages for the publication by
the defendant of the following article, which was claimed to be a
libel upon the plaintiff:

"A NARROW ESCAPE FROM BEING BURIED ALIVE.— A well-to-do
farmer found stiff and cold by the road-side; he is supposed to
have been frozen to death; a coroner takes charge of the case and
impannels a jury; the inquest interrupted by a physician, who
declares the man to be alive; animation restored.

"About nine o'clock last Friday morning a stiffened body was
found in the highway opposite the residence of John Morehouse,
about two miles north of Seneca Falls. To all appearances the man
was frozen, the limbs were rigid, the face was pale, the eyes had a
glassy look and there were no signs of life. Mr. Morehouse placed
the supposed corpse in a wagon and conveyed it to Seneca Falls,
where he delivered it to the police. It was placed in Mr. Metcalf's
store and Coroner Purdy was notified. A case of this kind always
attracts a crowd. The people gathered and scanned the face of the
supposed dead man. Every one pronounced him dead — frozen to
death. He was recognized as John Hammell, a farmer living two
and a-half miles south of the village. He had started for home the
night before, but apparently became bewildered and went north
instead of south. About ten o'clock some one knocked at Mr.
Morehouse's door and asked for a drink of water. The family had

retired, and supposing the stranger to be a tramp, he was told that the well was outside and he could help himself. This is supposed to have been Hammell, who was found near by the next morning. Coroner Purdy arrived, summoned a jury and began to inquire according to law how and by what means the man then and there lying dead came to his death. Dr. Lester looked at the supposed remains and after a careful examination said the man was alive. They laughed at him, but he insisted so strongly that life was still within the stiffened body that Nicholas Durnir, a brother-in-law of the deceased, caused the body to be removed to his store. The coroner's inquest was then interrupted, and the inquest and perhaps a funeral was averted. It was about 11 A. M. that Dr. Lester commenced his work of restoring life. Between two and three in the afternoon he was enabled to pry open his patient's mouth and administer some hot sling. Soon after the eyes opened and closed and the physician felt sure of his case, while those who had contended that the man was dead were satisfied of their error. About seven o'clock in the evening he showed more signs of life and seemed to make an effort to speak. He remained unconscious, however, until about four o'clock Saturday morning, when he awoke as from a long dream. He could not remember the past, however; knew that he started from home, but all after that was a blank. By nine o'clock Saturday morning consciousness was fully restored; and although his fingers, toes, nose and ears are badly frozen, he will recover. He was removed to his home Saturday afternoon. Mr. Hammell can thank Dr. Lester for the fact that the coroner's jury did not return a verdict that he came to his death from exposure, that he was not placed in a coffin and buried alive, and that his family and friends were not called upon to mourn his unfortunate death."

*Peter H. Van Auken,* for the plaintiff.

*John Van Voorhis,* for the defendant.

DWIGHT, J. :

The action was libel. The plaintiff was a physician and surgeon, practising his profession, and was also one of the coroners of Seneca

county. The alleged libelous publication consisted of an article in the newspaper printed by the defendant, representing in effect that the plaintiff as coroner had held an inquest on a man, supposing him to be dead, when he was in fact alive, and that the man would have been pronounced dead, and buried alive, but for the fortunate arrival on the scene of another physician, who discovered that the man was living and succeeded in resuscitating him.

The complaint charges the publication with innuendoes to the effect that it was made of and concerning him in his profession of a physician, and in his office of a coroner.

The judge at the circuit, after hearing all the evidence, directed a verdict for the defendant, on the ground that the publication was not libelous *per se,* and that there was no proof of express malice, but on the contrary that the allegation of malice was disproved.

It is apparent that the correctness of this decision turns upon the first point involved, for if the publication was libelous *per se,* then no proof of express malice was required. In that case, viz., if the publication was libelous in itself, and was not true and not privileged, then the law presumes malice and the presumption is conclusive.

To make the publication libelous *per se,* it was only necessary that it should tend to bring the plaintiff into obloquy or disgrace, ridicule or disrepute. Can it be said that such was not the tendency of the publication in question? Was it not calculated to bring disgrace or ridicule upon a physician to say of him, in substance, that he did not know on inspection whether a man was alive or dead? And was there not the same injurious tendency in the comparison implied in the last statement of the narration, viz., that the man might thank Dr. Lester that he was not pronounced dead and buried alive?

It is true that the publication does not mention the fact that the plaintiff was a physician, but he was so in fact, and was known to be so by the public among whom he lived; and the publication had the same tendency to bring him into disrepute as a physician where he was so known, as if it had named him as such. It is not necessary to mention a man's profession or calling in order to libel him in it.

We think it must be held that the publication was libelous *per*

se. If so, it was error to hold that proof of express malice was necessary, or that the presumption of malice could be rebutted.

It was no doubt competent for the defendant to prove all the circumstances of the publication in mitigation of damages; if possible to reduce the legal malice to the minimum, — but the publication being held to be libelous, and conceded to be false and not claimed to be privileged, there was no complete defense possible; the plaintiff was entitled to a verdict; it was for the jury to say whether for nominal or substantial damages.

For the error indicated the motion for a new trial must be granted.

Smith, P. J., and Hardin, J., concurred.

New trial ordered, costs to abide the event.